**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

     v.

BRADLEY W. PATTEE,

    Defendant.

**DECISION & ORDER**
12-CR-6183

## Preliminary Statement

By Order of Judge Charles J. Siragusa, dated December 14, 2012, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 6). On December 14, 2012, defendant Bradley W. Pattee (hereinafter Pattee or defendant) was indicted on thirteen counts of production, distribution, and possession of child pornography. See Indictment (Docket # 11). Currently before the Court are the defendant's motions to (1) suppress evidence seized on April 10, 2012 from 620 Surrey Hill Way after agents executed a court authorized search warrant (Docket # 24) and (2) suppress statements the defendant made on April 10, 2012 during an interview with Department of Homeland Security agents (Docket # 19). The Government has filed papers in opposition to the motions. (Docket ## 20, 26.) A suppression hearing was held June 14, 2013, after which both the Government and defense counsel filed supplemental briefs. (Docket ## 33, 34). The following is my Report and Recommendation as to the defendant's suppression motions.

## Relevant Facts

On the morning of April 10, 2012, just before 8:00 a.m., a group of law enforcement officers arrived at 620 Surrey Hill Way in Rochester, New York to execute a search warrant.[1] Hearing Transcript ("Tr.") 7. Special Agent Edward Williams testified that he was part of the entry team and after helping securing the residence he returned to his vehicle to retrieve the search warrant, the case file, a notepad, and a pen. Tr. 11-12. According to Agent Williams, he was assigned to be the "secondary interviewer" that day, taking notes of an interview that would be conducted with the defendant, Bradley Pattee. Id. Agent Williams testified that upon reentering the residence, the defendant, Special Agent Adam Ouzer, and "one or two additional agents" were in the dining area of the residence. Tr. 14. According to Agent Williams, no weapons were drawn. Tr. 15. Agent Ouzer explained to Pattee that the officers had a "warrant to search the residence for any type of evidence related to child exploitation," and he provided the defendant with a copy of the search warrant, which the defendant read. Tr. 16. Including the agents indoors and out in their vehicles, there were approximately eight to ten agents at the residence. Tr. 31.

The agents asked to speak with Pattee and he agreed. Agent

---

[1] The search warrant had been signed by United States Magistrate Judge Marian Payson on April 3, 2012.

Williams, Agent Ouzer, and the defendant then sat down at the dining room table. Tr. 16–17, 47. Special Agent Williams testified that Pattee was asked and not ordered to sit at the table and the defendant was not handcuffed at the table or at any other point. Tr. 17–18. The agents asked the defendant what his plans were for the day, and the defendant responded that he typically leaves for work at approximately 8:00 a.m. Tr. 19. When the agents informed the defendant that he was free to leave for work, Pattee declined. Id. The agents informed Pattee that, for safety purposes, "if he decided that he wanted to stay at the residence, that an agent would have to be with him, that he couldn't just wander freely throughout the house during the execution of the warrant." Tr. 19. Agent Williams testified that the defendant "could have left," and that option was communicated to the defendant, who indicated that he understood. Tr. 20. Additionally, Agent Williams testified, "We informed [the defendant] that no one was under arrest and that we had no plans of arresting anyone that day," and Pattee acknowledged the agents' explanation of their intentions. Id.

During the time they were at the residence, the agents found the defendant's demeanor to be "reserved," and his answers were "articulate." Tr. 22. The agents spoke to Pattee about his programming career, computers, file sharing programs, and child pornography. Id. During their twenty minute conversation, Pattee answered the agents' questions, and he did not indicate that he

3

wished to remain silent or speak to counsel. Tr. 23. Agent Williams described the agents' demeanor as "conversational" and stated that neither of the agents raised their voices when speaking with the defendant. Tr. 24. However, Agent Williams testified that the agents did not read Pattee his Miranda rights at any point or advise the defendant that he did not have to speak with the agents because, in Agent Williams's view, "this was not a custodial interrogation." Tr. 30.

At some point after the interview, all of the occupants of the house were ordered to evacuate the residence by the "bomb squad."[2] Tr. 37. Pattee remained outside with the agents for approximately thirty to forty-five minutes. Id. However, Agent Williams testified that after the interview at the dining room table ended at 8:23 a.m., he did not ask the defendant more questions about child pornography or anything about their investigation into child pornography. Tr. 50.

## Discussion

Suppression of Statements: It is well settled that law enforcement officers are required to give Miranda warnings before questioning a person who has been "taken into custody or otherwise

---

[2] During the search a suspicious sealed pipe was found in the residence. Although the defendant explained that the pipe contained gold coins, the pipe was nevertheless "rendered safe" by members of the bomb squad. Tr. 37-39.

4

deprived of his freedom of action in any significant way." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). Here, the admissibility of Pattee's statement depends on whether the defendant's right to warnings required by <u>Miranda</u> had attached.

In moving to suppress the statements he made to law enforcement, Pattee claims: "The conduct of law enforcement on April 10, 2012 lead me to the conclusion that I was not free to leave during this interrogation." Bradley Pattee Affidavit (Docket # 25) at ¶ 8. "Decisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." <u>United States v. Mitchell</u>, 966 F.2d 92, 98 (2d Cir. 1992). Thus, even in the absence of an actual arrest, an individual shall be deemed to be in custody when "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." <u>United States v. Kirsh</u>, 54 F.3d 1062, 1067 (2d Cir. 1995), *cert. denied*, 516 U.S. 927 (1995); <u>see also</u> <u>United States v. Hall</u>, 421 F.2d 540, 545 (2d Cir. 1969), *cert. denied*, 397 U.S. 990 (1970) ("[I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so."). The test for custody is an objective one based on the

totality of circumstances surrounding the particular encounter at issue. See Stansbury v. California, 511 U.S. 318, 323 (1994). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

There is no bright line litmus test for determining when or whether a suspect has been placed in custody for Miranda purposes.

> Courts have looked at various factors in making this determination. These include: whether a suspect is or is not told that she is free to leave, see Campaneria v. Reid, 891 F.2d 1014, 1021 n.1 (2d Cir. 1989); the location and atmosphere of the interrogation, see Oregon v. Mathiason, 429 U.S. 492, 494-95 (1977); the language and tone used by the police, see United States v. Guarno, 819 F.2d 28, 31-32 (2d Cir. 1987); whether the suspect is searched, frisked, or patted down, see United States v. Wilson, 901 F. Supp. 172, 175 (S.D.N.Y. 1995); and the length of the interrogation, see Berkemer, 468 U.S. at 437-38.

Tankleff v. Senkowski, 135 F.3d 235, 244 (2d Cir. 1998). In United States v. Newton, the Second Circuit expanded on the proper test for determining whether an individual is "in custody" for Miranda purposes. 369 F.3d 659, 671-72 (2d Cir. 2004). The court in Newton adopted a two part analysis: the court must determine (1) "whether a reasonable person would have thought he was free to leave," and, if not, (2) "whether his freedom of action has been curtailed to a degree associated with formal arrest." Id. (internal quotation marks omitted).

After careful review of the totality of the circumstances surrounding the interview on April 10, 2012, and after consideration of the various indicia of "custody," including the factors identified in <u>Tankleff</u>, I conclude that the defendant was clearly not in custody at the time he made his statements to Special Agents Williams and Ouzer.

First, the location and the atmosphere of the questioning do not support a finding of custodial interrogation. Pattee was interviewed at his home and seated at his dining room table. "[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." <u>Newton</u>, 369 F.3d at 675 (citing <u>United States v. Mitchell</u>, 966 F.2d 92, 99 (2d Cir. 1992)). Second, there was no evidence of any coercion, threats, or other improper conduct by law enforcement that would have tended to "undermine the individual's will to resist and to compel him to speak." <u>United States v. Morales</u>, 834 F.2d 35, 38 (2d Cir. 1987). Rather, the hearing testimony confirms the agents spoke in a conversational tone during the brief twenty minute conversation, Pattee did not appear to be upset or anxious, and Pattee never sought to end the interview or request the questioning be stopped. Third, the defendant was never placed in handcuffs or physically retrained during the interview. Handcuffing a suspect or otherwise imposing "arrest-like restraints" during an interview may cause a reasonable person to believe that they are not free to

7

leave. See Newton, 369 F.3d at 670, 676 ("Handcuffs are generally recognized as a hallmark of a formal arrest."). Finally, the hearing testimony confirms that Pattee was specifically advised by the agents that he was <u>not</u> under arrest and was free to leave his residence. This too is an important factor in determining custody for purposes of Miranda. See United States v. Luchetti, No. 11CR143A, 2012 WL 6949520, at *5 (W.D.N.Y. Aug. 10, 2012) (no Miranda warnings required where interview took place during the course of a search warrant and the defendant was told he was not under arrest and he was free to leave his residence while search was being conducted). In sum, given the particular circumstances present here, I find that a reasonable person in the defendant's position would have thought himself free to terminate the questioning and leave. Accordingly, it is my Report and Recommendation that Pattee's motion to suppress the statements he made to law enforcement on the morning of April 10, 2012 be **denied.**[3]

---

[3] Having determined that a reasonable person in the defendant's position would have felt free to terminate the interview and leave, I need not analyze and determine whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." Newton, 369 F.3d at 672. Nevertheless, the fact that the interview took place during the execution of a search of a defendant's residence does not equate to custodial interrogation. See United States v. Badmus, 325 F.3d 133, 138–39 (2d Cir. 2003) (finding no custody where agents asked the defendant and his wife to stay seated in the living room during execution of search warrant and did not allow free movement about the apartment).

Suppression of Physical Evidence: On April 3, 2012, Magistrate Judge Marian Payson signed a search warrant for 620 Surrey Hill Way in Rochester, New York. See Exhibit "B" annexed to Docket # 19. Pattee claims that the search warrant was invalid because it was based on "stale" probable cause. See Affirmation of Adrian J. Burke (Docket # 24) at 2 (citing Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991)). Specifically, the defendant argues that the three and one half month time period between law enforcement's detection of an internet protocol (IP) address associated with child pornography and the execution of the search, without any "fresh" incriminating evidence being discovered, renders any facts used to establish probable cause for the search "stale." Id.

In support of his staleness argument, defense counsel relies in large part on two cases decided by United States District Judge Richard J. Arcara: United States v. Coon, No. 10-CR-110A, 2011 WL 1871165, at *3 (W.D.N.Y. May 16, 2011) and United States v. Ohlson, No. 11-CR-225-A, 2012 WL 913037, at *2 (W.D.N.Y. Mar. 16, 2012). In both these cases Judge Arcara analyzed the concept of staleness in relation to search warrants that seek images of child pornography digitally stored on computer hard drives. In both cases Judge Arcara acknowledged that "numerous courts have recognized that digital files remain on computers for extensive periods of time," so "the passage of time does not necessarily render the evidence stale." Coon, 2011 WL 1871165, at *3; see also

9

United States v. Barker, No. 5:11-cr-73, 2012 WL 12543, at *4 (D. Vt. Jan. 3, 2012) ("Numerous courts have found that information which is months, if not years old, is not stale when a suspect is alleged to possess child pornography.") (collecting cases). However, in both Coon and Ohlson, there was the passage of at least a year between the alleged downloading of child pornography files and the execution of the search warrant. Faced with such an extended delay, Judge Arcara warned that "[t]he essential question was not just whether there was probable cause to believe that evidence would be in the computer, it was also whether there was probable cause to believe that the computer or other evidence of child pornography offenses would still be in defendant's residence after more than a year." Ohlson, 2012 WL 913037, at *3.

There are several reasons to distinguish Coon and Ohlson from the search warrant at issue here, not the least of which is the time period between the downloading and the search. In both Coon and Ohlson, more than a year passed from the time where there existed probable cause to believe that a computer within the target residence had downloaded child pornography and the execution of the search warrant. The passage of time was critical to Judge Arcara's probable cause analysis:

> Ordinarily, where the time between the downloading of the pornography and the search of the residence is relatively brief, it is easy to infer that the computer is still at the location where the pornography was downloaded. <u>The shorter the time between</u>

> those two events, the stronger the inference.
> Conversely, as more time passes between the
> initial download and the search of the
> residence, the more attenuated probable cause
> becomes.

Coon, 2011 WL 1871165, at *3 (emphasis added).

Here, the delay is far less – three and a half months – so the inference that the computer remained at the residence is stronger, rebutting a possibility of staleness. See, e.g., Barker, 2012 WL 12543, at *4 (seventy-one days between the date of the alleged downloading and the issuance of the warrant did not render the evidence stale); United States v. Patt, No. 06-CR-6016L, 2008 WL 2915433, at *13 (W.D.N.Y. July 24, 2008) (finding that "the relative short length of time between the computer activity and the warrant (eight months) and the capability of forensic experts to locate material on a computer that a user has 'deleted,' the warrant should not be struck down as stale"); United States v. Lamb, 945 F. Supp. 441, 460 (N.D.N.Y. 1996) (where search of residence executed more than five months after last known transmission of child pornography involving defendant occurred, evidence in warrant application was not so stale that probable cause was lacking); see also Government's Response to Defendant's Supplemental Omnibus Motions (Docket # 26) at 7 (collecting cases).

Moreover, in the warrant application submitted to Judge Payson, Agent Ouzer averred that a computer utilizing a particular IP address was participating in a peer-to-peer file sharing

protocol. See Adam J. Ouzer Affidavit in Support of a Search Warrant (Docket # 1) at ¶ 8. Such activity allows users to trade digital files through a worldwide network formed by linking computers together. Id. at ¶ 5. Using hash algorithms, Agent Ouzer determined that on December 20, 2011, the IP address under investigation was offering to share ninety-five individual files whose hash values matched files previously identified in child exploitation investigations. Id. at ¶ 8. After downloading and viewing five files, Agent Ouzer determined that the files contained four images of illegal child pornography, two of which he described in his search warrant application. Id. Three days later, Agent Ouzer confirmed that the subscriber for the IP address under investigation was the defendant and that he lived at 620 Surrey Hill Way. Id. at ¶ 10. While it is true that Agent Ouzer waited several months to take further action on the investigation, aside from the passage of time, there is nothing to independently suggest that during the period between discovering the files and the search itself the computer was removed from the residence or the subscriber moved away from the premises. Indeed, as set forth in Agent Ouzer's affidavit, an April 2, 2012 surveillance of the Surrey Hill residence revealed two cars and a motorcycle at the residence, and all three vehicles were registered to Pattee. Id. at ¶ 11. The very next day the search warrant application was submitted to and signed by Judge Payson. See Application for a

Search Warrant (Docket # 1). The ability of defense counsel to hypothesize the <u>possibility</u> that someone could have moved the router to another location along with the computer does not eliminate the <u>probability</u> that the dwelling where the subscriber resides contained digitally stored child pornography files.

Finally, even assuming *arguendo* that the delay between the sharing of the child pornography files and the execution of the search rendered the probable cause stale, I find that the warrant was not so facially deficient that reliance upon its legality by the agents executing the search would be unreasonable. See <u>United States v. Leon</u>, 468 U.S. 897, 922-23 (1984) (finding that "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" need not be excluded where the officers "acted in good faith in conducting the search"). As Judge Arcara himself held in <u>Ohlson</u>:

> No hard and fast rule exists to guide law enforcement agents as to when information supporting of a search warrant becomes too stale to provide probable cause in the totality of the circumstances relevant to the assessment of probable cause to search. This case amply demonstrates that exactly when probable cause becomes lacking due to the passage of time is a determination upon which reasonable judicial minds can differ. In fact, other courts have found probable cause in circumstances involving much longer delays than were present in the instant case and objectively reasonable reliance upon search warrants issuing on even much more stale evidence.

<u>Ohlson</u>, 2012 WL 913037, at *5. Faced with a delay of over a year

in Ohlson, Judge Arcara found that "[t]he information in the warrant affidavit in this case was certainly not stale as to the computer that accessed the images of child pornography and was not so stale as to defendant Ohlson's residence as to negate objectively reasonable reliance upon the warrant by the law enforcement agents who executed it." Id. at *6. For the same reasons, the good faith exception to the exclusionary rule applies here, and the defendant's motion to suppress is **denied**.

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that the defendant's motions to (1) suppress statements made at 620 Surrey Hill Way (Docket # 19) and (2) suppress evidence seized on April 10, 2012 from 620 Surrey Hill Way after agents executed a court authorized search warrant (Docket # 24) be **denied**.

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: October 21, 2013
Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:   October 21, 2013
         Rochester, New York

---

[1] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).